UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DWAYNE WHITE, Administrator of the Estate
of Bradley C. Scarpi, Deceased,

        Plaintiff,

   v.

ST CLAIR COUNTY SHERIFF RICHARD
WATSON, ST. CLAIR COUNTY, OFFICER
MARK J. HARRIS, OFFICER RODNEY
WILSON, OFFICER CHRISTOPHER
LANZANTE, OFFICER DANTE S.
BEATTIE, OFFICER NICHOLE LIEBIG,
OFFICER JON KNYFF and OFFICER JAMES
WAGENER,

        Defendants.

Case No. 16-cv-560-JPG-DGW

## MEMORANDUM AND ORDER

This matter comes before the Court on the defendants' motion for summary judgment
(Doc. 76). Plaintiff Dwayne White, administrator of the estate of Bradley C. Scarpi, deceased,
has responded to the motion (Doc. 91), and the defendants have replied to that response (Doc. 99).

## I.    Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind.,
Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the
light most favorable to the nonmoving party and draw all reasonable inferences in favor of that
party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520
F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the

Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

## II. Facts

Construed in the light most favorable to the plaintiff, the evidence and the reasonable inferences that can be drawn from it establish the following relevant facts for purposes of the pending summary judgment motion. Further discussion of the facts will be included as necessary in the legal analysis that follows this section.

### A. Scarpi's Detention

The plaintiff's decedent, Bradley C. Scarpi, was detained in the St. Clair County Jail ("Jail") from April 14, 2014, to May 23, 2014, when he committed suicide. Scarpi suffered from mental illness—including generalized anxiety disorder and depression—and drug addiction, and had been in the Jail on numerous prior occasions, at which time his mental health problems were noted. Defendant Richard Watson is the St. Clair County sheriff under whose authority the Jail was maintained.

On April 14, 2014, Scarpi was arrested by a Belleville police officer and brought to the Jail. As part of the booking process, the arresting officer asked Scarpi questions necessary to fill out a field booking form, including seven caution questions designed to indicate special needs in the jail[1] and eight questions in a "Brief Jail Mental Health Screen" designed to detect the need for further mental health evaluation (Doc. 76-2). Scarpi answered "no" to all of the caution and mental health screen questions. Larry Casey, the Jail's booking officer, reviewed Scarpi's "no" answers to the questions without asking Scarpi the questions again. Casey did not notice anything in Scarpi's mood or manner that made him concerned about Scarpi's mental health. Nor did he consult information from Scarpi's prior detentions showing he suffered from mental illness. Casey did not refer him for further mental health evaluation. In fact, Scarpi was suffering emotionally from the recent deaths of his mother and sister, but he did not mention this to the arresting officer or to Casey.

Following his booking, Scarpi was assigned to be housed in the Annex B ("AB") cell block. Twelve days later, on April 22, 2014, a nurse assigned to work at the Jail performed a mental health screening and evaluation. He disclosed to the nurse the recent loss of his mother and sister, but he indicated that he did not have a history of psychiatric treatment, that he was not thinking of killing himself, that he had not previously attempted suicide, that he was not showing signs of depression, that he did not have a suicide plan or instrument, that he was not feeling helpless or hopeless, and that he was not under the influence of drugs or alcohol. His behavior during the examination did not indicate any mental health problem, so the nurse concluded that he suffered from no mental health problem (Doc. 81 at 4).

Scarpi remained housed in the AB cell block until May 23, 2014. Scarpi was suicidal

---

[1] The caution questions asked whether the detainee is "homosexual," "violent," "suicide risk," "escape risk," "weakling," "informant," or "mental."

around that time and confided in Daniel Nail, his cellmate, that he was thinking about "ending it all." Nail thought Scarpi seemed depressed and upset about the recent loss of his mother and sister as well as about problems he was having in the cell block with other detainees.

At about 4:00 p.m. on May 23, 2014, Scarpi reported to defendant Officer Mark J. Harris that he needed to move to a different cell because he was being threatened by other nearby detainees. In response, Harris took Scarpi to talk with Sergeant Brian Cunningham in Cunningham's office. Cunningham talked with Scarpi about the threats he was experiencing and then reassigned him to the Lower Level B ("LL-B") cell block, the cell block farthest from the detainees who had been threatening Scarpi. In talking with Scarpi, Cunningham saw nothing that alerted him that Scarpi may want to kill himself or that he was experiencing mental health problems.

Harris took Scarpi back to his cell in the AB cell block to gather his property. As they left the cellblock, other detainees taunted and ridiculed Scarpi. Harris began walking Scarpi to the LL-B cell block and was joined by defendant Officer Rodney Wilson. On the way to his new housing assignment, Scarpi told Harris and Wilson that he was also in danger in the LL-B cell block because the detainees threatening him in the AB cell block had friends in that cell block. Using his radio, Wilson told Cunningham of Scarpi's fear, so Cunningham order that Scarpi be instead moved to a maximum security cell block, the E-Max cell block.

Assignment to the E-Max cell block was normally viewed by detainees as a form of punishment because the cells were small and the detainees there were extremely restricted. Each cell had a barred inside door and a second solid outside door with a small window between the cell and the hallway. Cunningham made this assignment not as punishment but for the purpose of

4

protecting Scarpi in light of the fact that he would have a single cell there and that there was insufficient time before the shift change to conduct an adequate evaluation of where Scarpi could be housed to be away from his enemies. Other housing was available at the time but was not used.

When Wilson and Harris arrived at the E-Max cell block, defendant Jail Officer Jon Knyff unlocked cell 5, and Wilson and Harris placed Scarpi in that cell. Cell 5 was not a "suicide-proof" cell, that is, a cell designed to prevent inmates from taking their own lives. Scarpi was claustrophobic, so placement in the small E-Max cell exacerbated his stress. Neither Wilson, Harris nor Knyff sought mental health assistance for Scarpi.

There is a factual dispute about whether Wilson, Harris and Knyff knew Scarpi was suicidal when they placed him in the E-Max cell. Wilson and Harris testified that they perceived no distress from Scarpi during the cell move and that, on the contrary, he behaved calmly and rationally. However, David Brown, another detainee housed in the eight-cell E-Max cell block, has provided affidavit testimony that he saw two officers escorting Scarpi to his cell, that he heard Scarpi tell them loudly, multiple times, that he was going to kill himself, and that the officers responded sarcastically without taking Scarpi's statements seriously. Knyff, who unlocked Scarpi's E-Max cell, was present while he was placed in the cell. Consequently, he saw and heard whatever interactions Scarpi had with Wilson and Harris. The Court will discuss the resolution of this factual dispute later in its legal analysis.

Once Scarpi was placed in the cell, officers conducted "health and well-being checks" in the E-Max cell block at least every thirty minutes as required by Jail policy. Knyff performed three checks before the end of the shift a little after 5:00 p.m. and did not observe anything unusual about Scarpi. Defendant Officer Christopher Lanzante took over on the following shift and

performed numerous cell checks (on at least one occasion, another officer filled in for Lanzante while he was on break).   On most of the checks, Lanzante saw Scarpi lying on his bunk and did not detect anything unusual.   He performed the checks quickly.

There is a factual dispute about whether Lanzante found out Scarpi was suicidal on one of his checks.   Lanzante testified that Scarpi was lying on his bed during all the checks and that nothing appeared out of the ordinary.   Four other detainees in the cell block have provided affidavits in which they state that on one of Lanzante's final checks, he had a conversation with Scarpi in which Scarpi told him he was thinking about killing himself, but that Lanzante ignored Scarpi's statement.   Detainee Ronnie J. Gully Jr. also states in his affidavit that, after Lanzante's conversation with Scarpi, he himself told Lanzante that Scarpi was suicidal, and Lanzante once again responded with indifference.   There is video evidence that on one check at approximately 8:46 p.m. Lanzante spent about twenty-two seconds in front of Scarpi's cell door then about twenty seconds in front of Gully's cell door.   Lanzante conducted another check around 9:14 p.m. and saw nothing out of the ordinary.

At approximately 9:30 p.m., Lanzante accompanied a nurse around the E-Max cell block while she went into cells to distribute medicine to detainees.   Scarpi was not scheduled to get any medicine, so his cell door was not opened and the nurse did not enter his cell.   Lanzante did not look into Scarpi's cell until he was on his way out of the cell block about four minutes after he and the nurse entered it.   He noticed Scarpi standing by the interior barred door of his cell, but on a closer inspection a few seconds later, he saw Scarpi had a noose around his neck.   Lanzante opened Scarpi's solid cell door to get a better look at him and saw that he was hanging from a noose tied to his barred cell door.   Lanzante immediately left the cell block to summon backup

and assistance. Defendant Officers Dante Beattie, Nicole Liebig, James Wagener and others responded to Scarpi's cell. They found Scarpi alive, and he was taken to the hospital. He died later that evening.

Following Scarpi's suicide, the Jail conducted an investigation. The investigation did not include interviews with all detainees and staff who encountered Scarpi in the days before he killed himself. Specifically, it did not include interviews of the detainees in the E-Max cell block, even those it had reason to believe knew of relevant facts. Overall, the investigation did not meet professionally accepted standards for post-suicide investigation. Nevertheless, the investigating officer concluded jail staff did not violate any policies leading to Scarpi's suicide.

B.     Jail Policies and Practices

Watson, as sheriff, adopted a number of policies and practices relating, either directly or indirectly, to suicide prevention and detection of mental illness among detainees at the Jail. In adopting these policies and procedures, Watson attempted to comply with the Illinois Jail Standards, 20 Ill. Admin. Code pt. 701 (2013).

The Jail's standard booking practice, which was used when Scarpi was admitted to the Jail, employed unconventional booking form terminology. Further, it did not require *the booking officer* to ask the detainee the caution questions or administer the "Brief Jail Mental Health Screen." Instead, the standard practice was to review the answers the detainee gave to and noted down by *the arresting officer* and only ask the detainee a question if there is no answer noted. The Illinois Jail Standards regarding physical and mental health assessments, 20 Ill. Admin. Code 701.40(i)(1) (2013), required the admitting officer to "observe the detainee for . . . general mental status" and to "*determine by questioning* whether the detainee . . . [h]as any indications of mental

illness, developmental disabilities or dual diagnosis; [or] [h]as any suicidal tendencies as determined by the use of an approved screening instrument or history of medical illness" (emphasis added); *see also* 20 Ill. Admin. Code 701.40(i)(2) (2013) (requiring mental health professional or "a jail officer" to conduct the screening). Other than reviewing the answers given to the arresting office and observing a detainee for unusual behavior, no other standard practice existed for the booking officer to learn of a detainee's mental illness where the detainee failed to report it himself. If a mental health need was detected during the booking process, either from the detainee's answers to the questions or his behavior, the booking officer was to refer the detainee for a further mental health evaluation. There was no system for tracking whether the further evaluation occurred.

As permitted by the County Jail Standards, 20 Ill. Admin. Code 701.90(b)(1)(B) (2013), the Jail contracted with Wexford Health Sources, Inc. to provide detainees with medical and mental health services. Wexford's policies stated that it would ensure necessary mental health services were available to detainees at the Jail. Its policies provided for a qualified health professional to conduct a mental health screening of a detainee within fourteen days of arrival at the Jail, *see* 20 Ill. Admin. Code 701.90(c)(3) (2013), followed by a mental health evaluation if a detainee had a positive mental health screen. The policies further provided for additional evaluation of a detainee referred by Jail staff based on the detainee's mental health complaints or inappropriate/abnormal behavior. Those with serious mental health problems were to be referred for mental health care. Ongoing monitoring and support were provided for detainees who needed continuing follow-up, but Wexford staff did not develop comprehensive written mental health treatment plans for mentally ill detainees. Instead, the doctor issued and evaluated orders

regarding safety and medication on more of an *ad hoc* basis.

Wexford provides annual training to Jail staff on recognizing cues that indicate potential suicide and how to respond appropriately. Detainees identified by Jail staff as at risk for suicide were referred to mental health professionals as soon as possible. There was no policy to evaluate detainees in connection with placement in the maximum security units like E-Max cell block.

The Jail had a written Jail policy regarding suicide prevention entitled "Quiet Room/Suicide Watch Policy and Procedure" ("Quiet Room policy"). That policy provided guidance for placing suicidal detainees in a housing unit referred to as the Quiet Room, removing items they may use to harm themselves, and monitoring detainees—suicide watch—in the Quiet Room. Under the policy as it was implemented, once a Jail employee identified a detainee as potentially suicidal, the detainee should be placed in the Quiet Room for observation, medical staff should be notified, and a psychological referral should be made. Once a detainee was housed in the Quiet Room, a Wexford counselor would visit him every day and make a recommendation to security staff about whether he should stay in the Quiet Room or be released to the general population. There was no other interactive process by which mental health staff and security staff could exchange information about a detainee's mental health. A detainee was removed from the Quiet Room and housed in general population only after Wexford medical staff determines it was safe. The Quiet Room policy did not address treatment plans.

In practice, not every Jail officer observed the Quiet Room policy to the letter. Some ignore detainees' suicide threats. Others would do some investigation before implementing the Quiet Room to determine whether a suicide threat was real or was for some other reason like, for example, playing on the sympathy of family members so they would send a detainee money or just

seeking a break from a chaotic cell block.

Despite these policies and practices, suicide and suicide attempts were not unknown at the Jail.   A little more than two months before Scarpi's suicide, another detainee—Joshua B. Jurcich—committed suicide in the Jail.   Based on his answers in the "Brief Jail Mental Health Screen," Jurcich's booking officer had referred him for further mental health evaluation, although he never saw a mental health professional.   Several days after booking, Jurcich was in an altercation with Jail staff in which staff used force, and Jurcich was taken to be seen by the nurse. The nurse completed a mental health screening and evaluation, which indicated Jurcich had a history of psychiatric problems and medications.   The nurse referred Jurcich for routine mental health follow-up.   Jurcich was placed in a maximum security cell in F-Max cell block, which was similar to the cells in the E-Max cell block.   There, he told several Jail officers making their thirty-minute checks that he was going to kill himself, and several hours later he hung himself from the bars of his cell door.

Three other detainees—Rachel Mills, Jerry Davis and Preston Young—attempted to commit suicide in the months before Scarpi's death, Davis and Young attempting only days before Scarpi.   Despite answering yes to half of the questions in the "Jail Brief Mental Health Screen" and noting a history of mental health problems, Mills was not referred for further mental health evaluation.   Three days later, she was found sitting with a noose around her neck.   She was moved to the Quiet Room and was seen by medical staff.   Ten days after that, Mills informed a Jail officer she was not suicidal but needed help, so she was moved to the infirmary and the medical staff was notified.   Davis and Young were both identified at booking as in need of further mental health evaluation.   Several hours after his booking, Davis wrapped a shoe string around

his neck.   He was moved to the Quiet Room until he was transported to the hospital for treatment of a medical problem.   After booking, Young was seen several times by mental health professionals.   When a Jail officer saw him standing on his bed with a blanket tied around his neck, Young was moved to the Quiet Room and medical staff was notified.

Four other detainees— Carlos Rickman, Jessica Hart, Rodney Brown, and Ramone Parker—had attempted to commit suicide in the nine years before Scarpi's death.   In 2005, Rickman twice attempted to harm himself and was placed in restraints in the Quiet Room.   On other separate periods of detention he was housed in the Quiet Room.   In 2008, Hart attempted to kill herself by cutting her wrists and drinking Febreeze.   In January 2013, she tried again by drinking bleach.   On both occasions, she received medical treatment and was placed in the Quiet Room in the female section of the Jail.   In June 2013, Brown held a razor against his neck and said he wanted to kill himself; he was taken to the Quiet Room.   In September 2013, Parker attempted to hang himself after a Jail officer ignored his threat to kill himself; he was placed in the Quiet Room.   Additional circumstances of these detainees' booking evaluation, mental health attention and other suicide prevention measures are not reflected in the record.

Despite knowing of Jurcich's suicide and the other suicide attempts, Watson did not change any of the Jail policies or procedures.   After Scarpi killed himself, another inmate committed suicide and eight others tried but were unsuccessful.

Around the time of Scarpi's suicide, the jail housed more detainees than its capacity on some days, sometimes by as many as twenty-two detainees, but at other times it was under capacity by as many as twenty-six detainees.   The Jail was also routinely short-staffed.

## III.    Procedural History

White, Scarpi's brother, filed this lawsuit as the administrator of Scarpi's estate.    In the

Third Amended Complaint, he asserts six causes of action:

**Count I:**  a claim under 42 U.S.C. § 1983 against Harris, Wilson, Lanzante, Knyff, Beattie, Liebig and Wagener (the "individual defendants") in their individual capacities for violation of the Fourteenth Amendment due process clause for deliberate indifference to the risk of suicide;

**Count II:**  a claim under 42 U.S.C. § 1983 against Watson in his official capacity for violation of the Fourteenth Amendment due process clause for deliberate indifference to the risk of suicide by failing to have adequate policies, practices and training;

**Count III:**  a claim under Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, against Watson in his official capacity for failure to accommodate Scarpi's mental illness;

**Count IV:**  a claim under the Illinois Wrongful Death Act, 740 ILCS 180/1, against the individual defendants on behalf of Scarpi's two minor sons;

**Count V:**  a claim under the Illinois Wrongful Death Act under a *respondeat superior* theory against Watson in his official capacity; and

**Count VI:**  a claim against St. Clair County for indemnification for the liability of the St. Clair County Sheriff's Department and its employees.

The defendants now ask the Court for summary judgment on all counts.    White concedes

in his response to the defendants' summary judgment motion that defendants Beattie, Liebig and

Wagener should be dismissed from Count I of this case, and the defendants do not object to this

disposition in their reply.    Accordingly, the Court will grant summary judgment for Beattie,

Liebig and Wagener on Count I.    It will address later in this order whether they belong in Count

IV, White's wrongful death claim.    The Court now turns to the remaining claims.

**III. Analysis**

A.      Count I:   § 1983 Claim for Due Process Violation

The plaintiff claims Harris, Wilson, Knyff and Lanzante were deliberately indifferent to the serious risk that Scarpi would commit suicide when they failed to take appropriate action to prevent his suicide.   Because Scarpi was a pretrial detainee, these claims fall under the Fourteenth Amendment due process clause rather than the Eighth Amendment cruel and unusual punishment clause, which applies only to convicted prisoners.   *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015); *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015).   Nevertheless, the standard under the Fourteenth Amendment is essentially the same as the Eighth Amendment standard. *Burton*, 805 F.3d at 784.

Under that standard, an official can be liable for failure to protect a detainee if he intends or was deliberately indifferent to a substantial risk of serious harm to the detainee.   *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).   To meet the "deliberate indifference" standard in this context, a prison official must know of an excessive risk to an inmate's health or safety and intentionally disregard it.   *Farmer*, 511 U.S. at 847; *Rosario*, 670 F.3d at 821.   "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer*, 511 U.S. at 837.   Deliberate indifference to a risk requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm" and "something approaching a total unconcern for [the detainee's] welfare in the face of serious risks."   *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (internal quotations and citations omitted); *accord Rosario*, 670 F.3d at 821.

Specifically with respect to the risk of suicide, a defendant must have been aware of a substantial risk that the decedent would seriously harm himself in the near future. Alternatively, he must have effectively been like an ostrich, burying his head in the sand by refusing to verify whether a substantial risk that he strongly suspected might exist actually existed. *Id.* at 843 n. 8. It is possible to show that an official actually knew of the risk because of circumstantial evidence or because the risk was obvious, longstanding, pervasive or well-documented. *Id.* at 842. Factors relevant to determining whether a defendant actually knew of a detainee's suicide risk include, for example, whether the decedent said he was having suicidal thoughts, indicated he needed mental health treatment, had a known history of suicide attempts or mental illness, or had been on suicide watch recently. *See* 7th Cir. Pattern Jury Instr. 7.19 n. c (2017) (collecting cases).[2]

It is clear that suicide is a serious harm, *Rosario*, 670 F.3d at 821, so the Court focuses on whether a reasonable jury could find, based on the evidence presented that Harris, Wilson, Knyff and Lanzante were deliberately indifferent to the need to protect Scarpi from it.

### 1. Harris, Wilson and Knyff

Harris, Wilson and Knyff argue that they were not aware that there was a strong likelihood

---

[2] There is some uncertainty about whether *Kingsley* changed the standard applicable to suits by pretrial detainees. In *Kingsley*, a pretrial detainee sued for excessive force, and the Supreme Court held that the appropriate standard was whether the officers' purposeful or knowing use of force was objectively unreasonable, not whether the officers were subjectively aware that their use of force was unreasonable. *Id.* at 2470. *Kingsley* calls into question whether deliberate indifference is the correct standard for a pretrial detainee's conditions of confinement claim, but the Seventh Circuit Court of Appeals has suggested the Eighth Amendment standard still applies. *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 n. 31 (7th Cir. 2016). *But see Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 856-58 (7th Cir.), *cert. denied*, 138 S. Ct. 361 (2017) (applying objective unreasonableness standard to conditions of confinement claim). However, it has declined to decide definitively whether *Kingsley* changed the applicable standard in claims other than excessive force claims. *See Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017); *Smego v. Jumper*, 707 F. App'x 411, 412 (7th Cir. 2017).

that Scarpi would try to kill himself. They were not aware of any history of suicide attempts, mental illness, mental health treatment or suicide watch. They point to their testimony that Scarpi behaved calmly and rationally as they placed him in the E-Max cell and gave no indication that he might try to hurt himself or that he might need mental health attention. However, as noted before, there is a factual dispute because David Brown, a detainee housed in the E-Max cell block, gave affidavit testimony that Scarpi told the two officers accompanying him loudly and multiple times that he was going to kill himself and then fought with them because he did not want to be placed in the cell. Brown's affidavit is the only evidence that Harris, Wilson and Knyff were on notice of Scarpi's risk of suicide. They ask the Court to disregard Brown's affidavit on the grounds that it is hearsay and unable to be put into a form that is admissible at trial because Brown refused to attend his own deposition.

It is true that in ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial, although it need not be presented at the summary judgment stage in a form that would be admissible at trial. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir.), *cert. denied*, 137 S. Ct. 493 (2016); *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010); *see Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Ordinarily, affidavit testimony may be considered on summary judgment if the substance of the affidavit would be admissible if the affiant was called to testify. *See, e.g., Cairel*, 821 F.3d at 830 (affidavit considered on summary judgment because content of affidavit was not inadmissible hearsay). The content of Brown's affidavit is not hearsay because it is not offered to prove that Scarpi was actually going to kill himself but instead to prove what Harris, Wilson and Knyff were aware of at the time. *See id.* at 831 (statement offered to prove knowledge of defendant rather than for the

truth).

The Court further finds it premature to exclude Brown's testimony from its consideration on the grounds that Brown failed to attend his deposition. When Brown refused to attend his deposition, the defendants did not seek an order enforcing the third-party deposition subpoena. Only after such an order may a party seek any kind of sanction regarding the admissibility of the absent deponent's evidence. Furthermore, if a third party fails to obey a Court order to testify, he may be deemed "unavailable" for hearsay purposes, Fed. R. Evid. 804(a)(2), and his affidavit may be admissible anyway under the circumstances set forth in Federal Rule of Evidence 807(a). Because they have not moved to compel Brown's deposition and have not considered whether his affidavit would be admissible at trial under Rule 807, Harris, Wilson and Knyff have not carried their burden of showing White is unable to present Brown's testimony at trial because Brown refused to be deposed.

Considering Brown's affidavit and the other evidence in the case, a reasonable jury could find Harris and Wilson were aware, based on Scarpi's statements that he was going to kill himself, of a strong likelihood that Scarpi would actually do so in the near future. Similarly, a reasonable jury could find Knyff heard Scarpi's statements and therefore was also aware of that risk. Because none of the three did anything to address Scarpi's mental health needs and suicide threats, a reasonable jury could find they were deliberately indifferent to those needs. Count 1 survives summary judgment as to Harris, Wilson and Knyff.

        2.    <u>Lanzante</u>

Lanzante also argues that he was not aware that there was a strong likelihood Scarpi would try to kill himself. Like Harris, Wilson and Knyff, he was not aware of any history of suicide

attempts, mental illness, mental health treatment or suicide watch. He points to his testimony

that, until he found Scarpi hanging from his cell bars, he only saw Scarpi lying down and did not

ever talk with him. He also denies talking with detainee Gully shortly before Scarpi was found

hanging from his cell bars. Again, however, there is a factual dispute because four E-Max cell

block detainees—Gully, David Garcia, Randy McCallum and Dominic Hood—have sworn in

affidavits that they heard Scarpi tell Lanzante that he was going to kill himself.

Again, the defendants raise procedural arguments why the Court should not consider the

detainees' affidavits. They object to the use of McCallum's and Hood's affidavits because,

although they were deposed, their affidavits lack foundation and are premised on speculation.

Specifically, although they both state that a detainee (McCallum identified him as housed two cells

from his; Hood identified him as having a Caucasian voice and being in his 20s or 30s) threatened

to kill himself while Lanzante was present, the defendants fault their affidavits because they were

not able to identify the voice as Scarpi's and they did not have a clear line of sight to see Lanzante

interacting with the detainee threatening suicide.

The Court finds McCallum's and Hood's testimony, if presented at trial, would not be

inadmissible for lack of foundation or because it is premised on speculation. They both had

personal knowledge of a detainee saying he was suicidal, and there is enough circumstantial

evidence about the identity of the detainee that a reasonable jury could conclude it was Scarpi

talking to Lanzante. Any weaknesses in McCallum's and Hood's opportunity to identify Scarpi's

voice or actually see any interaction with Lanzante are factors to be brought out on

cross-examination. They do not render McCallum's or Hood's testimony inadmissible. The

affidavits of McCallum and Hood, especially in combination with video evidence showing

Lanzante stopped for approximately twenty-two seconds in front of Scarpi's cell door shortly before he found him hanging from his cell bars, are enough for a reasonable jury to conclude that Scarpi told Lanzante—and that Lanzante knew—Scarpi was suicidal. The Court will therefor deny summary judgment to Lanzante.

The Court adds a few words about the affidavits of Gully and Garcia, which the defendants ask the Court to ignore for reasons similar to those it invoked with respect to Brown's affidavit. Gully refused to attend his deposition pursuant to a subpoena issued in this case, although he was deposed in a related case involving Jurich's suicide—*Corbier v. St. Clair County*, No. 16-cv-257-SMY-SCW (S.D. Ill.)—in which he testified about the events in the E-Max cell block the day Scarpi killed himself. The same attorneys represented the parties in both cases and had agreed that discovery in one could be used in the other. The defendants have not shown that they sought to enforce the deposition subpoena in this case by court order. In such a proceeding the Court would likely have considered and clarified whether Gully's deposition in *Corbier* was sufficient for purposes of this case. As things stand, the defendants have not established Gully's testimony would be inadmissible at trial or that he would not be deemed "unavailable" for hearsay purposes.

The defendants report that Garcia "has not been made available for testimony" by a court in Missouri and is now facing sentencing before United States District Court for the Eastern District of Missouri. Defs.' Mot. Summ. J. 22 n.1 (Doc. 76). However, the defendants have not set forth what efforts they have made to depose Garcia, and without knowing those efforts—including whether the defendants have even tried to depose him—the Court will not disregard his affidavit testimony.

For the foregoing reasons, the Court will deny summary judgment on Count I as to Harris, Wilson, Knyff and Lanzante.[3]

B.    Count II:   § 1983 Municipal Claim for Due Process Violation

The plaintiff claims Watson in his official capacity—that is, the St. Clair County Sheriff's Department itself, *see Franklin v. Zaruba*, 150 F.3d 682, 686 (7th Cir. 1998) ("§ 1983 suits against sheriffs in their official capacities are in reality suits against the county sheriff's department")—was deliberately indifferent to the serious risk that Scarpi would commit suicide by its inadequate policies, practices and training.

A local government body such as a sheriff's department may not be held liable under § 1983 on a *respondeat superior* theory.   *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 (1978).   However, it can be liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the county caused the constitutional violation.   *Id.* at 694; *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000).   A governmental body is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694.

To prove municipal liability on a deliberate indifference claim, the plaintiff must show "that the municipal action was taken with deliberate indifference as to its known or obvious consequences. . . .   A showing of simple or even heightened negligence will not suffice."   *Board*

---

[3] Even if the reasonableness standard of *Kingsley* applied in this case, summary judgment would still not be warranted.   A reasonable jury could find Harris, Wilson, Knyff and Lanzante responded unreasonably to Scarpi's risk of suicide.

*of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). Deliberate indifference by a municipality may be shown, for example, where municipal decisionmakers are put on notice that a policy or practice is ineffective and leads to constitutional violations, but they continue to adhere to the same approach. *Id.*

Watson argues that the Jail's policies are adequate and comply with the County Jail Standards, 20 Ill. Admin. Code pt. 701 (2013), including policies to identify mental health needs, to address potential suicidal detainees, and to contract with Wexford to have qualified Wexford medical personnel treat detainees' mental illnesses. Watson argues the other suicides and suicide attempts in the Jail are not factually similar to Scarpi's so could not have put the Jail on notice of weaknesses in its policies that could have led to Scarpi's death. He notes that (other than Scarpi's complaints to the four individual officers remaining in Count 1, which Watson denies) Scarpi displayed no indications he would hurt himself.

White maintains that the Jail's policies caused Scarpi's suicide. The Court addresses each policy argued by White in turn.

1. Booking Process

White claims the booking process routinely failed to identify detainees in need of mental health treatment and to refer them for mental health treatment because (1) the caution questions and the "Brief Jail Mental Health Screen" were completed by the arresting officer, who was unlikely to get candid answers, (2) it did not include a search of mental health information from previous detentions at the Jail, and (3) it did not require any follow-up to ensure mental health evaluation was actually received. He claims if Casey had been forced to ask Scarpi the questions himself instead of simply reviewing the answers Scarpi gave the arresting officer, Casey might

have become engaged in a conversation in which he might have discovered Scarpi was still mourning the recent deaths of his mother and sister, which would have caused him to refer Scarpi for further mental health evaluation. White also believes if Casey had consulted Scarpi's records from prior detentions, he would have seen a history of mental illness and referred him for urgent mental health evaluation.

The Court believes no reasonable jury could find the booking process, even if imperfectly designed and executed, displayed deliberate indifference to Scarpi's mental health needs. It included a screening test designed to quickly and simply identify mental health and other needs requiring further evaluation for those who could not wait fourteen days for medical staff to conduct a more in-depth screening. The need for evaluation was marked and passed on to medical staff. It is true that the process was not always implemented properly by booking officers, as was the case with the failure to refer Mills for further evaluation despite her "Brief Jail Mental Health Screen" answers, but improper application in one instance does not indicate a widespread practice. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) ("[A] single instance of allegedly unconstitutional conduct does not demonstrate a municipality's deliberate indifference to the constitutional rights of its inhabitants.").

It is also true that the screen could have been improved by requiring officers to look at a detainee's prior mental health information in the file and to follow up on mental health evaluation referrals. However, no evidence suggests that Jail policymakers knew or had reason to know that the screen would be less reliable if the arresting officer, as opposed to the booking officer, asked the relevant questions; that the screen would fail to detect current mental health needs with the questions it contained; or that referrals for further mental health evaluation did not occur as

anticipated.   Nor is there evidence that Jail policymakers ignored or turned a blind eye to these facts by continuing a process they knew was inadequate.[4]   True, the screen was not the most in-depth evaluation and was not executed in the most effective way, but no evidence suggests it was not a good-faith effort by the Jail to identify mental health needs quickly and respond appropriately to them if a detainee could not wait fourteen days for a more complete evaluation by a trained Wexford employee.   This is not deliberate indifference.

The Court further believes no reasonable jury could find that any flaw in the booking process was the moving force behind Scarpi's suicide.   Any harm flowing from a less than searching process to detect mental illness immediately upon his arrival at the Jail was cured when a nurse, who is more qualified than a Jail officer to identify mental illness, performed the more in-depth mental health screening and evaluation twelve days later and discovered Scarpi's recent family deaths.   Despite knowing this information, the nurse still found Scarpi fit for general population placement without mental health follow-up.   This conclusion may have been wrong, but it was not obtained through a process that was deliberately indifferent to Scarpi's mental health needs.   Any harm caused by a deficient initial screening became irrelevant when a better screening was conduct twelve days later.

For these reasons, the Court will grant summary judgment for Watson on Count II to the extent it relies on the booking process.

---

[4] To the extent White relies on events post-dating Scarpi's death as evidence that deliberate indifference in the booking process caused his death, his reasoning is flawed.   Later events could not have had any effect on Jail officers' knowledge of the effectiveness of the booking process screens at the time Scarpi was booked such that Jail policymakers could have been or should have been on notice that the booking process could cause Scarpi harm.   The same may not necessarily be said for future suicides or suicide attempts in light of Watson's current knowledge of alleged problems with the booking process, although that question is not before the Court at this time.

2.    <u>Quiet Room Policy</u>

White claims the Quiet Room policy was inadequate because it addressed only what a Jail officer should do if a detainee says he is suicidal or if he attempts suicide, not how he should deal with potentially suicidal inmates, the creation of treatment plans, or communications between Jail staff and Wexford's mental health staff.

Like the booking process, the Quiet Room policy might have had room for improvement, but it does not evidence deliberate indifference on the part of the Jail's policymakers.   The evidence shows that once the Quiet Room policy was implemented, it was generally effective to prevent further suicide attempts and to put the relevant detainee in touch with mental health professionals, although there may have been a few exceptions.   No evidence suggests Jail policymakers knew or should have known that, once implemented, the Quiet Room policy was inadequate to prevent suicide and address mental health needs.

Relevant to Scarpi's case, no evidence shows that, at the time of Scarpi's suicide, Jail policymakers knew the Quiet Room policy did not work such that they could have been deliberately indifferent by continuing with that policy.   At that point in time, they knew that Jurcich had not been sent to the Quiet Room before committing suicide, and that those who had attempted suicide earlier had all been sent to the Quiet Room after their suicide attempts and had made no further attempts while in the Quiet Room.   The policy appeared to be achieving its aims. For this reasons, the Court will grant summary judgment for Watson on Count II to the extent it relies on the adequacy of the Quiet Room policy.

White also claims that, despite the practice of implementing the Quiet Room policy whenever a detainee threatens suicide, it was a widespread policy for Jail officers to ignore the

Quiet Room policy either by ignoring suicide threats or by assessing the credibility of a detainee's suicide threat before taking action. Detainees and Jail officers alike have stated that the Quiet Room policy was regularly not observed. The Court believes that such evidence creates a genuine issue of material fact whether it was a widespread practice to disregard the Quite Room policy and whether it was so widespread that Jail policymakers must have known about it and allowed it to continue knowing of the obvious risks. If it is a known widespread practice, and if Harris, Wilson, Knyff and Lanzante indeed failed to abide by the Quiet Room policy with Scarpi, the widespread practice could have been a cause of Scarpi's death. Accordingly, although it is a close call, the Court will deny summary judgment to Watson on Count II to the extent it relies on the practice of disregarding the Quiet Room policy.

### 3.   Understaffing

White contends that the Jail had a policy of being understaffed and that the policy caused Scarpi's death. He suggests that had there been adequate staff, Lanzante would have taken more time on his thirty-minute cell checks to see if Scarpi was okay.[5]

No reasonable jury could find the Jail's understaffing was a cause of Scarpi's suicide or that the Jail was aware that its staffing level at the time of Scarpi's death was so insufficient that it increased the risk for his suicide. White claims if the jail was not understaffed, Lanzante would have spent more time interacting with Scarpi on his thirty-minute checks. However, he has not presented any evidence to support that proposition. Without any details about the understaffing and how it manifested itself with respect to Scarpi's detention, White's argument is pure speculation and could not support a jury verdict that understaffing in any way caused Scarpi's

---

[5] White also points to a number of other instances after Scarpi's suicide where closer monitoring of detainees identified as having mental health problems would have detected suicide attempts earlier. As noted earlier, events post-dating Scarpi's suicide are not relevant to Jail policymakers' knowledge—and thus any deliberate indifference—leading to his suicide.

death.   Watson is entitled to summary judgment on this theory of Count II.

       4.       Screening on Placement in Segregation

White contends the Jail was deliberately indifferent by failing to have a policy of screening all detainees placed in segregation, like the E-Max cell block, to determine whether there are factors counseling against segregation.   He notes that such screenings are commonly accepted professional practices.

No reasonable jury could find Jail policymakers exhibited deliberate indifference by failing to conduct a screening either before or immediately after a detainee was placed in segregation.   No evidence suggests Jail policymakers were aware or should have been aware at the time Scarpi was place in the E-Max cell block that the Jail's practice of placing detainees in segregation without screening them created a risk of suicide or that the policy of conducting cell checks every thirty minutes was inadequate to ensure a detainee's safety even in the E-Max cell block.   Watson is entitled to summary judgment on this theory of Count II.

       5.       Inadequate Post-Suicide Investigation

White claims the Jail had a policy of conducting inadequate investigations after suicides and suicide attempts.   In support of this position, he points to the less-than-thorough investigation completed after Scarpi's suicide.

A single shoddy investigation does not establish a policy of inadequate investigation. Additionally, there is no way the investigation of Scarpi's suicide could have caused that suicide because it occurred later in time.   Watson is entitled to summary judgment on this theory of Count II.

In sum, the Court will grant summary judgment to Watson on Count II on all theories

except that a widespread practice of ignoring the Quiet Room policy demonstrated deliberate indifference to Scarpi's needs.

C.    Count III:    ADA Failure to Accommodate

White claims Scarpi was disabled because of his mental illness and that Watson denied him accommodations for that disability when Scarpi was not housed in a suicide-proof cell.    As the Court noted in its order denying Watson's motion to dismiss (Doc. 37), White's theory is not that the Jail declined to provide a service to Scarpi because of his disability but that it failed to make reasonable modifications of his housing assignment to accommodate his known disability, thus preventing him from participating in a Jail program or activity.    *See* 42 U.S.C. § 12132; 28 C.F.R. § 41.56.    To prevail under the ADA on a failure to accommodate theory, a plaintiff must prove that (1) he is a qualified person, (2) he has a disability and (3) the defendant denied him access to a program or activity because of his disability by failing to make a reasonable accommodation or modification.    *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (under virtually identical Rehabilitation Act).

Watson argues that White's claim is nonsensical because a suicide-proof cell is not a service from which Scarpi was excluded, mental illness does not require a suicide-proof cell, and Scarpi was treated exactly like other detainees who were not suicidal.    He also challenges White's ability to prove essential elements of his case.

As a preliminary matter, the Court does not find Scarpi's claim nonsensical, as Watson suggests.    White claims Scarpi suffered from a mental illness that seriously impaired major life activities.    He claims Scarpi was eligible to receive housing and other services from the Jail where was otherwise rightfully detained, but because of his disability, he required special housing that

included precautions against suicide.   He claims Jail personnel knew of his disability and its resulting suicidal ideation, yet purposefully failed to provide him the necessary housing to accommodate that disability and that, as a consequence, White was unable to participate in any of the programs, activities and services provided by the Jail because he died.   White's claim is similar in its essence to an ADA claim a wheelchair-bound detainee would have against a jail that failed to provide him a wheelchair-accessible cell.   While the Court does not express any opinion on the legal viability or the ultimate merits of White's ADA reasonable accommodation claim, it does not find it nonsensical at all.

        1.   <u>Disability</u>

Under Title II of the ADA regarding discrimination in public accommodations, "qualified individual with a disability" means "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."   42 U.S.C. § 12131(2).   A "disability" includes "a physical or mental impairment that substantially limits one or more major life activities of such individual."   42 U.S.C. § 12102(1)(A).   Regulations promulgated under the ADA, in turn, define "mental impairment" as "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities."   29 C.F.R. § 1630.2(h)(2).   Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as major bodily functions. 42 U.S.C. § 12102(2).

Courts should construe this definition of disability "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Indeed, the 2008 ADA Amendments Act, Pub. L. 110-325, 122 Stat. 3553 (2008), aimed "to make it easier for people with disabilities to obtain protection under the ADA," and to shift the focus of ADA litigation to "whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

Watson has not established that White is unable to prove Scarpi had the mental impairment of mental illness in the form of generalized anxiety disorder and depression based on his 2009 diagnosis and his 2014 suicide. Watson has also failed to demonstrate that a reasonable jury could not find Scarpi's mental illness impaired a major life activity such as his thinking and caused him to commit suicide, impairing all of his life activities. Watson has not convinced the Court that impairment of major life activities by suicide is not covered by the ADA's definition of substantial impairment of a major life activity. Consequently, the Court cannot say as a matter of law that Scarpi was not disabled under the ADA

2.      Denial of Program or Activity

The Court further finds a reasonable jury could find the Jail denied Scarpi access to all of the programs, activities and services provided by the Jail by failing to provide him the special housing his disability required in order to continue his living.

3.      Failure to Made Reasonable Accommodation

Whether the Jail knew of Scarpi's need for an accommodation is more complicated, for there is no evidence Jail personnel knew of Scarpi's present mental illness until he was brought to

the E-Max cell block.   In the employment context under Title I of the ADA, a person seeking a

reasonable accommodation must first tell the employer of his disability, and then the employer is

obligated to participate in an interactive process to work with the disabled employee to see if a

reasonable accommodation can be made.   *See Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055,

1061 (7th Cir. 2014).   The employer is liable if it fails to engage in the interactive process and if a

reasonable accommodation could have been offered but was not.   *Id.*

The Court sees no reason not to demand a similar process in the public accommodations

context.   *See Gonzales v. Bexar Cty.*, No. SA-13-CA-539, 2014 WL 12513177, at *5 (W.D. Tex.

Mar. 20, 2014) (granting summary judgment on ADA claim for denial of suicide-resistant cell

where detainee did not ask for accommodation and the need was not "open, obvious and

apparent"), *aff'd*, 584 F. App'x 232 (5th Cir. 2014).   First, before liability can be imposed on the

Jail under the ADA, Scarpi was required to inform the jail of his disability or show that it was

obvious.   He did not do this until his final day and, in fact, up to that point he denied mental illness

or suicidal thoughts whenever he was asked and displayed no obvious signs that he was suicidal.

Thus, Watson cannot be liable under the ADA for failing to accommodate Scarpi's special housing

needs prior to sending him to the E-Max cell block.

There is evidence, however, that Scarpi informed Harris, Wilson, Knyff and Lanzante in

the E-Max cell block that he was going to kill himself.   It is true he did not specifically say, "I

suffer from a disability—mental illness—and request an accommodation."   However, the Court

believes a reasonable jury could find the need for suicide-prevention measures as an

accommodation to someone threatening suicide may have been obvious.   The Jail officers, in

turn, did not inquire further as to what Scarpi needed to accommodate his mental illness and did

not send him to the Quiet Room, a reasonable response to a suicide-inducing mental illness. Because Watson has not convinced the Court that White will be unable to prevail on his ADA failure to accommodate claim, the Court will deny summary judgment on Count III.[6]

D.    Count IV:   Wrongful Death

The plaintiff claims Harris, Wilson, Knyff, Lanzante, Beattie, Liebig and Wagener caused Scarpi's death because they knew Scarpi was a suicide risk and failed to take suicide preventive measures.    The defendants, on the other hand, argue that Scarpi's decision to commit suicide was an independent intervening act breaking the chain of causation.

An essential element of a claim under the Wrongful Death Act, 740 ILCS 180/1, is the defendant's breach of a duty to the decedent to protect him from a foreseeable harm that was the proximate cause of his death.   *Bovan v. American Family Life Ins. Co.*, 897 N.E.2d 288, 292 (Ill. App. Ct. 2008).   It is true that in cases alleging a defendant's negligence was the cause of death, generally a decedent's "voluntary act of suicide is an independent intervening act which is unforeseeable as a matter of law, and which breaks the chain of causation from the tortfeasor's negligent conduct."   *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1123 (Ill. 2015) (citing *Little v. Chicago Hoist & Body Co.,* 203 N.E.2d 902 (Ill. 1965)).   This rule is generally true unless the defendant had a duty to the decedent to prevent the suicide.   *Id.* at 1124 (citing *Winger v. Franciscan Med. Ctr.*, 701 N.E.2d 813, 820 (Ill. App. Ct. 1998) (rule inapplicable where mental health care professionals had professional duty to supervise decedent in their care with known suicidal tendencies)).   Under Illinois law, jailers have a general duty of care to their prisoners, including a duty to exercise ordinary and reasonable care under the circumstances of the particular

---

[6] Because White's ADA legal theory is not the typical ADA claim brought against a detention facility, the Court would welcome pretrial briefs on the specific legal questions to be presented to the jury in connection with Count III.

case against the possibility of suicide.   *Dezort v. Village of Hinsdale*, 342 N.E.2d 468, 472-73 (Ill. App. Ct. 1976); *see Jutzi-Johnson v. United States*, 263 F.3d 753, 756 (7th Cir. 2001) (noting suicide may be foreseeable consequence of jailer's negligence).

In Scarpi's case, the Court believes a reasonable jury could find, under the circumstances of this case, that Harris, Wilson, Knyff and Lanzante owed Scarpi a duty to prevent his suicide. When Scarpi announced to those defendants that he was going to kill himself, suicide became foreseeable to them, and it was their duty as his jailers to respond reasonably to try to prevent it. Their failure to implement the Quiet Room policy or some other reasonable suicide prevention measure could constitute a breach of that duty.   Because those defendants owed Scarpi a duty as his jailers, they are not necessarily absolved from liability by his act of suicide.   Therefore, the Court will deny summary judgment on Count IV as to those defendants.

However, there is no evidence from which a reasonable jury could find Scarpi's suicide was foreseeable to defendants Beattie, Liebig and Wagener.   The evidence shows those defendants only became involved with Scarpi after he had taken action to kill himself.   They could not therefore have caused his death.   The Court will grant summary judgment on Count IV as to those defendants.

E.      Count V:   *Respondeat Superior* Liability Under the Wrongful Death Act

The defendants ask for summary judgment on Count V on the ground that there is no *respondeat superior* liability for the claims the plaintiff brings:   42 U.S.C. § 1983 against individuals, 42 U.S.C. § 1983 against a municipality under *Monell*, ADA and the Wrongful Death Act.   As the Court has already explained in its order denying Watson's motion to dismiss, Count V seeks only to hold Watson liable under a *respondeat superior* theory for the Wrongful Death Act

claim. Claims seeking to hold a principal liable under the Wrongful Death Act for its agent's acts under a *respondeat superior* theory are permitted and are, in fact, common. *See, e.g., McHale v. W.D. Trucking, Inc.*, 39 N.E.3d 595 (Ill. App. Ct. 2015); *Davis v. City of Chi.*, 8 N.E.3d 120 (Ill. App. Ct. 2014); *Estate of Crandall v. Godinez*, No. 14-CV-1401, 2015 WL 1539017 (C.D. Ill. Mar. 31, 2015). Here, at the time of their alleged negligence causing Scarpi's wrongful death, Harris, Wilson, Knyff and Lanzante were acting as employee agents of the St. Clair County Sheriff's Department, which can therefore be liable for their negligent acts under a *respondeat superior* theory.

  F.  <u>Count VI: Indemnification by St. Clair County</u>

  The defendants ask the Court for summary judgment on Count VI, which seeks to have St. Clair County pay any damages assessed against the other defendants, on the basis that the Court will grant summary judgment to the defendants on all of those claims. Since that did not happen, the request for summary judgment on Count VI has no merit.

  G.  <u>Illinois Tort Immunity Act</u>

  The defendants argue that Watson, in his official capacity, and St. Clair County are absolutely immune from liability for state law torts under the Illinois Local Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/1-101.1 *et seq*. The purpose of the Tort Immunity Act "is to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1(a). Relevant to this case, the defendants note that the Tort Immunity Act states, "A local public entity is not liable for an injury resulting from an act or omission of its employee *where the employee is not liable*." 745 ILCS 10/2-109 (emphasis added).[7] They do not request summary judgment for any

---

[7] The defendants also cite numerous other provisions of the Tort Immunity Act that are not

defendant other than Watson and St. Clair County.[8]

The Tort Immunity Act could only immunize Watson and St. Clair County from White's Wrongful Death Act claim; all his other claims are federal claims not subject to state immunity rules. *Howlett v. Rose,* 496 U.S. 356, 375 (1990) ("The elements of, and the defenses to, a federal cause of action are defined by federal law."); *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1038 (7th Cir. 1998) (noting state immunity rules do not provide immunity from federal claims).

Furthermore, White does not seek to hold Watson or St. Clair County liable under the Wrongful Death Act for any of their own direct acts, which could trigger the immunities set forth in the Tort Immunity Act. On the contrary, Watson's liability under the Wrongful Death Act is under a *respondeat superior* theory and will necessarily be derivative of a meritorious claim against Harris, Wilson, Knyff or Lanzante. Watson will not be liable unless an employee is found liable, so immunity under 745 ILCS 10/2-109 would not apply. St. Clair County's liability to fund a judgment is derivative of Sheriff's Department employees' conduct as well. *Carver v. Sheriff of LaSalle Cty.,* 787 N.E.2d 127, 141 (Ill. 2003) ("Because the office of the sheriff is funded by the county, the county is therefore required to pay a judgment entered against a sheriff's office in an official capacity."); *see also* 745 ILCS 10/9-102 (requiring local public entity to pay tort judgment against an employee for conduct during the scope of his or her employment). Consequently, the Tort Immunity Act, 745 ILCS 10/2-109, provides Watson and St. Clair County

---

applicable because they provide immunity under theories not alleged in this case: for adopting or failing to adopt an enactment or failing to enforce a law, 745 ILCS 10/2-103; for exercising discretion in determining policy, 745 ILCS 10/2-201; based on conduct of a fellow-employee, 745 ILCS 10/2-204; and for failing to provide a jail facility or sufficient resources within that facility, 745 ILCS 10/4-103. White makes no such allegations against Watson or St. Clair County.

[8] In his response, White presents arguments why the individual defendants are protected by the Tort Immunity Act. However, since those defendants have not raised that argument in support of summary judgment, the Court need not discuss it.

no immunity from liability stemming from the Wrongful Death Act claims against Harris, Wilson, Knyff or Lanzante based on their wrongful conduct.   *See, e.g., Albert v. Board of Educ. of Chi.*, 24 N.E.3d 28, 40 (Ill. App. Ct. 2014) (finding board of education was an appropriate party under the Tort Immunity Act in wrongful death suit based on its employees' conduct).

>    H.    Qualified Immunity

The defendants argue that Watson and the individual defendants are entitled to qualified immunity for claims under 42 U.S.C. § 1983 in Counts I and II.   Qualified immunity is an affirmative defense that shields government officials from liability for civil damages in § 1983 suits where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000).   It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Watson is not entitled to qualified immunity because he is not being sued in his individual capacity.   Qualified immunity protects only defendants sued in their individual capacity (albeit for acts conduct under color of state law), not a municipal entity.   *Owen v. City of Indep.*, 445 U.S. 622, 638 (1980); *see American Trucking Ass'ns v. Smith*, 496 U.S. 167, 184-85 (1990); *Jaworski v. Schmidt*, 684 F.2d 498, 501 (7th Cir. 1982).   As for the individual defendants who have not already been dismissed by White and who may be entitled to qualified immunity because they are sued in their individual capacities, further inquiry is required.

The qualified immunity test has two prongs:   (1) whether the facts, taken in the light most

favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232; *see Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

The defendants rely solely on the first qualified immunity prong—no constitutional violation—so the Court need not inquire whether the right in issue was clearly established. They argue that Harris, Wilson, Knyff and Lanzante are entitled to qualified immunity "because their limited interactions with Scarpi further fail to evidence any violation of Scarpi's constitutional rights." Defs'. Mot. Summ. J. 42 (Doc. 76). The Court has already determined, however, that the evidence, viewed in the plaintiff's favor, shows that Harris, Wilson, Knyff and Lanzante may have violated Scarpi's Fourteenth Amendment due process rights. Accordingly, those defendants have not shown they are entitled to qualified immunity on Count I.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment (Doc. 76). The motion is **GRANTED** to the extent it seeks summary judgment on:

- o Count I against Beattie, Liebig and Wagener;

- o Count II based on Jail policies and practices except for a widespread practice of disregarding the Quiet Room policy; and

- o Count IV against Beattie, Liebig and Wagener.

The motion is **DENIED** in all other respects. Defendants Beattie, Liebig and Wagener are terminated as defendants in this case.

The following claims remain for trial:

- Count I against Harris, Wilson, Knyff and Lanzante for deliberate indifference to the risk of suicide;

- Count II against Watson in his official capacity based on a widespread practice of disregarding the Quiet Room policy;

- Count III against Watson in his official capacity under the ADA for failure to accommodate a disability once Scarpi announced he was going to kill himself;

- Count IV for wrongful death against Harris, Wilson, Knyff and Lanzante;

- Count V for wrongful death under a *respondeat superior* theory against Watson in his official capacity; and

- Count VI against St. Clair County for indemnification.

**IT IS SO ORDERED.**
**DATED:   May 2, 2018**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**