IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DWAYNE WHITE, as Administrator of the ESTATE OF BRADLEY C. SCARPI, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:16-CV-00560 |
| v. | ) ) ) | The Hon. J. Phil Gilbert |
| ST. CLAIR COUNTY SHERIFF RICHARD WATSON, *et al.*, | ) ) ) | Magistrate Judge Donald Wilkerson |
| Defendants. | ) | |

**PLAINTIFF'S MOTION *IN LIMINE* TO ADMIT EVIDENCE
OF SUICIDE-RELATED INCIDENTS AND THE DEFENDANTS'
ACTIONS AND INACTIONS SUBSEQUENT TO MR. SCARPI'S DEATH**

Plaintiff, through his counsel, moves this court for entry of an order clarifying the scope of the evidence that Plaintiff may present in support of his claim that the St. Clair County Jail has a widespread practice of disregarding the Quiet Room Policy (hereinafter sometimes referred to as the "Policy").

### INTRODUCTION

The Court's case management procedures provide, "[i]f you have reason to anticipate that any question of law or evidence is difficult or will likely provoke an argument, give the Court advance notice. The best procedure is prepare a brief or memorandum and submit it to the Court in advance of trial." Plaintiff anticipates that the Defendants will attempt to dispute the admissibility of the evidence described in this Motion. He therefore files this Motion to provide the Court (and opposing counsel) with notice so that these evidentiary issues may be resolved before trial, in an effort to avoid unnecessary delay.

As a result of this Court's summary judgment ruling, Plaintiff is entitled to a trial on whether jail officers' widespread disregard of the Policy contributed to Mr. Scarpi's suicide.

Doc. 113 at 24. Accordingly, Plaintiff seeks to admit violations of the Policy that occurred *prior* to Mr. Scarpi's suicide in order to prove that County officials were on *notice* that the Policy was being disregarded and that they took no action to abate violations of the Policy.

Plaintiff also seeks the admission of Policy violations that occurred *after* Mr. Scarpi's suicide. Plaintiff appreciates that actions subsequent to Mr. Scarpi's death can neither have caused his death nor demonstrate the Defendants' state of mind at the time of his suicide. *See* Doc 122 at 7; Doc 113 at 25. Plaintiff seeks the admission of post-suicide violations for a different purpose. As controlling Seventh Circuit law instructs, "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy." *See Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987). Plaintiff seeks admission of post-suicide events to show that violations of the Policy were simply "the way things were done" in the St Clair County Jail.

Accordingly, and as explained further, this Court should enter an order allowing Plaintiff to present evidence of Policy violations pre- and post-dating Mr. Scarpi's death, as well as evidence regarding the Defendants' actions and inactions after each violation, including but not limited to post-incident investigations.

## BACKGROUND

The purpose of the Quiet Room Policy is to "provide guidelines for detainees who are classified by jail staff, law enforcement officers or a mental health professional to be suicidal or homicidal in their behavior." Ex. A, Policy at 14. During intake screening, "detainees may be placed on suicide watch to help prevent any self-inflicted injury or suicidal behavior." *Id.* at 15. In addition, any "actions or verbal statements by detainees which indicate they may be suicidal/homicidal shall be justification to initiate suicide watch and placement in the quiet

room." *Id*. The Policy provides that when a detainee is moved to the Quiet Room, officers are required to make a "psychological referral." *Id.*

In the aftermath of a suicide, the "first thing" the Jail Superintendent does is "get a list of cell checks." Ex. B, McLaurin Dep. 40:19-22. The Jail Superintendent further testified that, with regard to preventing suicide, his responsibility is to "make[] sure that we conduct our cell checks in a timely manner." And to "make sure that we listen to inmates who have complaints; that an individual makes a comment about suicide we take appropriate action." *Id.* at 46:1-24 - 47: 1-6. The Jail's Cell Check Policy provides, in relevant part, that an officer is required to conduct cell checks every 30 minutes and that cell checks should consist of, "a) observing detainees actions/behavior; b) listening to any comments detainees are saying at that time." Ex. C, Cell Check Policy at 5.

The Quiet Room and Cell Check Policies are the only suicide prevention policies in effect in the Jail. Ex. B, McLaurin Dep. at 20:14-24. According to the Quiet Room Policy, if someone is a suicide risk—regardless of risk level—that person must be placed in the Quiet Room. Ex. A, Policy. The Quiet Room Policy further provides four separate levels of suicide watch: (1) continuous watch; (2) 15 minute watch; (3) 30 min watch; and (4) use of the restraint chair. Jail Superintendent McLaurin, who directly reports to Sheriff Watson, testified that he personally reviews each incident report generated by jail staff to identify any policy violations. Ex. B, McLaurin Dep. at 43:12-20. Major McLaurin further testified that he notifies Sherriff Watson about all suicides and all serious suicide attempts. *Id.* at 14:11-19.

As the Court observed in its summary judgment ruling, "despite these policies and practices suicide and suicide attempts were not unknown at the jail," and "despite knowing of [a] suicide and the other suicide attempts, Defendant Watson did not change any of the Jail policies

or procedures. After Scarpi killed himself, another inmate committed suicide and eight others tried, but were successful." Doc 113 at 10-11.

The record contains evidence of a substantial number of suicides, suicide attempts and related policy violations (*see* Appendix):

**Violation # 1: Jessica Hart—January 2013**

On January 19, 2013, jail officials placed Jessica Hart in the Quiet Room because she stated, "I'm feeling anxious, like I'm going to harm myself." Medical staff released her from the Quiet Room on January 20, 2013 and placed her in a regular living unit. Then, two days later, on January 22, 2013, jail staff provided Ms. Hart and her entire block with bleach for cleaning purposes. Ms. Hart proceeded to drink the bleach provided to her because, as she reported to a jail officer, she wanted to kill herself.

**Violation # 2: Rodney Brown—March 2013**

From March 3-5 2013, Rodney Brown repeatedly exhibited behavior jail officials documented as "odd" and "bizarre." He also repeatedly asked to be placed in the Quiet Room—officers refused each of his requests.

**Violation # 3: Ramone Parker–-May 2013**

On May 29, 2013, Mr. Parker informed jail officers that he needed to be transferred out of his cell block because, "[he] is a paranoid schizophrenic and [he] needs to be moved out of there [his cell block] or [he] will beat someone's ass." Officers proceeded to move him to E-Max but did not place him in the Quiet Room.

**Violation # 4: Rodney Brown—June 2013**

On June 2, 2013, notwithstanding Mr. Brown's behavior and verbal statements indicating his suicidality two months prior, officers did not confine Mr. Brown in the Quiet Room but

4

instead placed him in segregation. There, officers provided him with a razor blade, which he held against his neck while yelling about his intent to commit suicide. Only then did officers move Mr. Brown to the Quiet Room.

**Violation # 5: Ramone Parker—September 2013**

On September 5, 2013, while housed in E Max, Ramone Parker told officers he was going to kill himself by wrapping a sheet around his neck and hanging himself. Officers moved him to the Quiet Room. On September 9, 2013, officers again placed Mr. Parker in E Max. He told officers he would again kill himself by hanging and the officers ignored this outcry and left him in his segregation cell. Shortly thereafter, an officer found Mr. Parker attempting to hang himself and then initiated a Quiet Room move.

**Violation # 6: Rachel Mills—January 2014**

On January 15, 2014, Jail Superintendent McLaurin received an incident report indicating that detainee Rachel Mills had provided an officer with three notes indicating that she was struggling with suicidal ideation. According to this incident report, the officer took no action to move Ms. Mills, until after she received the third note. Even then, the officer moved Ms. Mills to the infirmary, not to the Quiet Room.

**Violation # 7: Joshua Jurcich—March 2014**

On March 11, 2014 (just over two months prior to Mr. Scarpi's death by suicide), Joshua Jurcich died by suicide in the Max unit (the same unit in which Mr. Scarpi killed himself) after Correctional Officers ignored Mr. Jurcich's expressions of suicidal ideation. Prior to Mr. Jurcich's suicide, multiple detainee witnesses heard Mr. Jurcich tell jail officers he intended to kill himself—and heard those officers ignore his outcry. Jail Superintendent McLaurin had knowledge that a witness heard Mr. Jurcich express suicidal ideation to an officer prior to killing

himself.  Mr. McLaurin conducted no inquiry to determine whether Quiet Room Policy violations contributed to Mr. Jurcich's death.

**Violation # 8: Jerry Davis—May 2014**

During his booking process on May 20, 2014, Jerry Davis informed officers that he was talking and/or moving more slowly than usual, that he had felt "useless or sinful" for a few weeks, and that he had previously been hospitalized for "emotional or mental health problems." An incident report reviewed by Jail Superintendent McLaurin indicates that on this same day jail officers placed Mr. Davis in a Recovery Cell—a cell that is not suicide proof.  Jail staff eventually found him there with a shoe lace tied around his neck in an attempt to hang himself.

**Violation # 9: Preston Young—May 2014**

After learning that his child's mother died in childbirth in February 2014 and requesting (and being denied) mental health services multiple times over several months, Preston Young attempted suicide by tying a blanket around his neck on May 22, 2014, the day before Mr. Scarpi's suicide.

**Violation # 10: Rodney Brown—July 2014**

On July 10, 2014, Officers had knowledge of Mr. Brown's prior indications of suicidality through his multiple suicide attempts the prior year.  Instead of placing Mr. Brown in the Quiet Room at booking, the jail housed him in the segregation unit. There, a jail officer found him with a sheet tied around his neck.  Instead of immediately removing Mr. Brown from the Max unit and placing him in the Quiet Room, the officer requested that Mr. Brown remove the sheet from around his neck and allowed him to remain in his cell alone and unsupervised while the officer completed his cell checks.  Only after the completion of the cell checks did the officer initiate a Quiet Room move for Mr. Brown.

**Violation # 11: Michael Knepper—October/November 2014**

On October 20, 2014, when Michael Knepper was booked into the jail, he indicated to jail staff that he was depressed, that he had been taking medication for mental health issues and that he previously had been hospitalized for mental health-related reasons. Officers then placed him in a booking cell. Approximately three hours later, Mr. Knepper told jail officers he had attempted suicide by ingesting pills. When taken to the hospital, he told medical staff there that he did not, in fact, ingest the pills. Jail staff housed Mr. Knepper on a regular unit—not in the Quiet Room. On November 7, 2014, Mr. Knepper cut both of his wrists with a jail issued razor. Only after he cut his wrists did officers move him to the Quiet Room. Then the next day on November 8, 2014, Mr. Knepper was left unsupervised in the Quiet Room long enough to use a metal piece off of the leg brace of his restraint chair to attempt to cut his wrists again.

**Violation # 12:  Carlos Rickman—March 2015**

On March 18, 2015, a jail officer documented that he received a witness report that Carlos Rickman "acts strangely" and has "punched himself in the face." Despite the fact that Mr. Rickman was reported to have engaged in self-harm, an action that may have indicated suicidal ideation, officers failed to initiate a Quiet Room move.

**Violation # 13: Demarken Cobbs—April 2015**

Demarken Cobbs was admitted to the jail on April 9, 2015. According to his booking form, he reported to officers that he was "bi-polar/schizo." He also indicated that he felt useless and sinful, that he was currently taking medications for mental health issues, and that he had previously been hospitalized for mental health-related reasons. Officers housed him in a regular housing unit. On April 14, 2015, an officer documented in an incident report that Mr. Cobbs stated, "you'll turn me into a monster if you keep me back here (in E-max) for that long" and that

7

"You know my meds fuck with me when I'm alone." On April 15, 2015, according to an incident report, Mr. Cobbs expressed his desire to harm and kill officers who work at the jail. Mr. Cobbs was not moved to the Quiet Room. Then, on April 29, 2015, in E-max, officers found Mr. Cobbs in his cell in the act of trying to hang himself. The officer reported in his incident report that Mr. Cobbs stated, "I can't take it in here no more. Put me in the Quiet Room before I kill myself."

**Violation # 14: Michael Knepper—April 2015**

On April 10, 2015, officers housed Michael Knepper in the infirmary and provided him with access to a razor blade, which he used to cut his wrists during a suicide attempt. At the time of this incident, officers knew or should have known of Mr. Knepper's past suicidal behavior—including serious instances of cutting himself with a razor and other instruments.

**Violation # 15: Carlos Rickman—April 2015**

On April 14, 2015, officers documented that Mr. Rickman, while housed in Lower Level E, was talking to himself all morning. As a consequence for this behavior, an officer denied him the bucket of cleaning supplies (the bucket was provided to all other detainees on the unit). On this same day, Mr. Rickman threatened the officer and was found to have possession of a shank (a sharpened spoon) in his cell. No officer initiated a Quiet Room move for Mr. Rickman despite indications he had the intent and means to harm himself or others.

**Violation # 16: Carlos Rickman—April 2015**

On April 20, 2015, Mr. Rickman again expressed homicidal ideation towards officers. Officers failed to initiate a Quiet Room move.

**Violation # 17: Michael Knepper—May 2015**

On May 12, 2015, Mr. Knepper refused all of his meal trays. At this point, given Mr. Knepper's extensive history of serious suicide attempts, jail officers uniformly knew he was at an elevated risk for suicide. An incident report reviewed by Jail Superintendent McLaurin indicates that Mr. Knepper's refusal to eat did not trigger a Quiet Room move. As Jail Superintendent McLaurin testified in his deposition, "[I]f an individual refuses to eat . . . that draws our attention. Why would you refuse to eat unless you are concerned about doing bodily harm to yourself?" Ex. B, McLaurin Dep. at 26:15-19.

**Violation # 18: Juliana Kavano-Mosely—July 2015**

Juliana Kavano-Mosely was admitted to the jail on July 10, 2015. His booking form indicates that he was currently taking medications for mental health-related problems and that he had been discharged from a hospital where he sought treatment for mental health issues a week prior to his booking. Despite these indications that Mr. Kavano-Mosely may be suicidal, jail officers placed him in a regular living unit. The next day, on July 11, 2015, officers found Mr. Kavano-Mosely in his cell, with his sheet tied around his neck and with lacerations to his wrists. By the time an officer found him, he was already foaming at the mouth and red in the face. It was not until after this suicide attempt that officers moved Mr. Kavano-Mosely to the Quiet Room.

**Violation # 19: Carlos Rickman—July/August 2015**

On July 10, 2015, while housed in E Max, officers found Mr. Rickman lying on his back, foaming at the mouth with his eyes dilated. After this incident, officers left Mr. Rickman, who in the months prior had demonstrated a number of behaviors indicating mental illness (including talking to himself), in E Max. No inquiry was made into what caused Mr. Rickman to foam at the mouth. A few

weeks later, officers found Mr. Rickman in his segregation cell with a sheet tied around his neck while attempting to hang himself. They then initiated a Quiet Room move.

**Violation # 20: Damon Stidimire—October 2015**

Damon Stidimire, a 19-year-old who had been exhibiting signs of extreme depression, was not placed in the Quiet Room and was instead left alone in his cell unsupervised. Mr. Stidimire died by hanging on October 29, 2015.

Despite having notice of the *nine* Quiet Room Policy violations and suicide-related instances listed above (including the suicide of Joshua Jurcich) that occurred prior to Mr. Scapri's suicide, Jail Superintendent McLaurin made no changes to jail policy or procedure. Ex. B, McLaurin Dep. at 195:14-21. Nor did McLaurin make any changes to jail policies or procedures after Mr. Scarpi's death or after the *eleven* Quiet Room violations (one of which resulted in the suicide of Damon Stidimire) that occurred subsequent to Mr. Scarpi's suicide.

In each instance listed above—even when clear violations of policy were reflected on officer-generated incident reports—McLaurin failed to hold anyone accountable for the violation and took no steps to prevent future violations. McLaurin claims that the Policy was not violated in any instance, but he failed in all of them to properly investigate how the suicides and attempted suicides were allowed to occur and to mitigate the risk of suicide in the jail. McLaurin has never disciplined any staff members as a result of actions or failures to act in connection with a suicide or suicide attempt.

In the aftermath of Mr. Scarpi's death, Mr. McLaurin did not interview (or direct the interviews of) any of the detainees housed next to Mr. Scarpi in the hours before his death. *Id.* at 258: 20-24-259:1. McLaurin failed to take this obvious step, despite the fact that one detainee

notified Mr. McLaurin in writing that he had heard Mr. Scarpi express suicidal ideation to Defendant Lanzante.

## ARGUMENT

I.  **QUIET ROOM VIOLATIONS PRE-DATING MR. SCARPI'S DEATH ARE ADMISSIBLE TO SHOW BOTH THE EXISTENCE OF A WIDESPREAD PRACTICE OF VIOLATING THE QUIET ROOM POLICY AND TO DEMONSTRATE THE DEFENDANTS' DELIBERATE INDIFFERENCE TO THE VIOLATIONS.**

Plaintiff seeks to admit evidence and to solicit testimony related to each of the violations listed above that occurred prior to Mr. Scarpi's death. Specifically, Plaintiff will seek the admission of the incident reports related to Violations 1-9 included in the Appendix to this Motion and will solicit testimony from Ramone Parker, Gabriel Boyd, Defendant Watson, and Superintendent McLaurin to establish that: (1) in the 16 months preceding Mr. Scarpi's death, jail officers violated the Quiet Room Policy nine times; (2) Superintendent McLaurin and/or Defendant Watson were on notice regarding each violation; and (3) neither Defendant Watson nor Superintendent Mclaurin took any action in the aftermath of any of the violations.

As the Court notes in its prior rulings, the incidents predating May 23, 2014 (the date of Mr. Scarpi's suicide) are admissible to show that the Defendants had notice of and were deliberately indifferent to an entrenched custom of violating the Quiet Room Policy. These incidents constitute the "series of bad acts" that will allow the jury to "infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned . . . the misconduct." *Hahn v. Walsh*, 762 F.3d 617, 636 (7th Cir 2014) (finding that in order to prove *Monell* liability based on widespread practice, plaintiff must prove the Defendants were aware of any risk posed by the challenged policy and failed to take necessary remedial steps); *see also Hall v. City of Chicago*,

989 F. Supp.2d 699, 708 (N.D. Ill. 2013) (stating that facts tending to show that the City policymakers were aware of the behavior of officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior, can prove a widespread practice *Monell* claim).

The Defendants intend to argue that the violations are too dissimilar from Mr. Scarpi's suicide to be admissible. To the contrary, many of the policy violations described above have facts in common with the Scarpi suicide (*e.g.,* officers ignoring indications of suicidality or self-harm from detainees in the segregation units (known as E or F Max); individuals hanging or attempting to hang themselves). All that is required is that the other incidents be *similar* to the one in issue; incidents that are not perfectly identical to Mr. Scarpi's are still admissible. *See, e.g., City of Canton, Ohio v. Harris*, 489 U.S. 378, 397-98 (1989) (municipal liability for failure to train requires "evidence at least of a pattern of similar incidents in which citizens were injured or endangered" (*citing with approval Languirand v. Hayden*, 717 F.2d 220, 227-228 (5th Cir. 1983))); *see also Grayson v. City of Aurora*, No. 13 C 1705, 2013 WL 6697769, at *4 (N.D. Ill. 2013) (finding that the plaintiff's requests for the defendants' personnel and complaint files was "reasonably calculated to lead to the discovery of admissible evidence relevant to his *Monell* claim," because "the documents may contain information that other similar complaints were filed against the individual Defendants").

Nor does Plaintiff need to show that other suicides *actually happened* as a result of the Quiet Room Policy violations. Plaintiff need only prove that staff were deliberately indifferent to the *risk* of suicide. *Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 2183998, at *41 (N.D. Ill. May 11, 2018) (explaining that the plaintiff need only "demonstrate that a municipal decision reflects deliberate indifference to *the risk* that a violation of a particular constitutional or

statutory right will follow the decision" (quoting *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 411 (1997))).

Consistent with the Court's prior rulings, Plaintiff must be allowed to present evidence as to Violations 1-9.

## II. QUIET ROOM VIOLATIONS POST DATING MR. SCARPI'S DEATH ARE ADMISSIBLE TO DEMONSTRATE CONTINUITY OF THE VIOLATIONS

The Plaintiff also seeks to admit evidence of Violations 10-20, which occurred after Mr. Scarpi's suicide. As this Court properly noted in its prior rulings, violations post-dating Mr. Scarpi's death are not admissible to prove the Defendants' state of mind at the time of Mr. Scarpi's death. Plaintiff does not seek their admission for that purpose.

Post-incident events *are* admissible for two other reasons: to prove that widespread policy violations existed at the jail; and to prove that the Defendants were deliberately indifferent because they continued to refuse to remedy the widespread problem as the violations continued. Under Seventh Circuit law, "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy." *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987). After Mr. Scarpi's suicide, Quiet Room Policy violations persisted resulting in one death by suicide, multiple individuals who attempted to kill themselves by hanging, and one individual who repeatedly cut himself in an effort to end his own life. There is no dispute that McLaurin and Watson received notice of each attempt—and there is no dispute that in the aftermath of each attempt, McLaurin and Watson took no action and made no changes to jail policy and practice. Courts widely recognize that this kind of post-event evidence is admissible to prove *Monell* claims. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir.1996) ("although it occurred after [the plaintiff's] experience, [the subsequent incident of alleged excessive force] may have evidentiary value for a jury's consideration [of] whether the City and

policymakers had a pattern of tacitly approving the use of excessive force"); *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir.1991) ("Contrary to the City's exhortation that the date an incident occurs marks the outside date for evidence-gathering on such an issue, we think that actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident."); *Starks v. City of Waukegan*, No. 09 C 348, 2013 WL 5874563, at *2 (N.D. Ill. 2013) ("A *Monell* claim may rest on alleged constitutional violations that occur after misconduct at issue in that case" because subsequent behavior can be indicative of Defendants' approval of the challenged practice.) Here, the violations post-dating Mr. Scarpi's death will help support Plaintiff's claims that Defendant Watson and Major McLaurin were deliberately indifferent to the risk posed by the Quiet Room Policy violations.

In one decision allowing the admission of post-event evidence to prove that a challenged practice was "the way things are done and the way things have always been done," the court cites a jury instruction to illuminate the distinctions between pre- and post-event evidence. The event at issue there occurred in July 1982. The court allowed post-event evidence with this limiting instruction:

> The events are not admissible as relating to or not independently admissible as relating to the cause of that turmoil at that time, but they are admissible only insofar as they may illuminate for you the policies and attitudes of the administration of the City of Everett as it existed prior to the incident, the theory being that *there may be a continuity in municipal policy so that what happens after the event may case some light on what the policy was prior to the event.* Now that's the only purpose for which I am admitting this post July '82 evidence.

*Estate of Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422, at *4 (N.D. Ill. Jan. 26, 1996) (emphasis added) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989)).

For these reasons, the Court should allow evidence as to Violations 10-20 to show continuity in the practice of violating the Quiet Room Policy and to show Defendant Watson's ongoing acquiescence in the violations. Plaintiff would have no objection to an instruction clarifying the limited purpose for which the jury is to consider this evidence.

### III. EVIDENCE DEMONSTRATING THE DEFENDANTS' ACTS SUBSEQUENT TO SUICIDES AND ATTEMPTS SHOULD BE ADMITTED AS PROOF OF DELIBERATE INDIFFERENCE TO QUIET ROOM POLICY VIOLATIONS

Plaintiff should be permitted to present evidence relating to: (1) the Defendants' failure to make any changes to policy or practice in the aftermath of Quiet Room violations that occurred from 2013-2015; (2) the Defendants' failure to ever discipline jail staff for suicide-related actions or inaction that constituted violations of the Quiet Room Policy; and (3) the Defendants' "ostrich"-like behavior in the aftermath of each Quiet Room Violation—among other things, McLaurin's failure to investigate witness statements that jail officers ignored Mr. Jurcich's and Mr. Scarpi's cries for help immediately before their suicides.

As this Court has noted, "deliberate indifference by a municipality may be shown, for example, where municipal decision makers are put on notice that a policy or practice is ineffective and leads to constitutional violations, but they continue to adhere to the same approach." Doc. 113 at 20 (internal citations omitted). In order to demonstrate that the Defendants here "continued to adhere to the same approach," Plaintiff should be allowed to present evidence regarding the Defendants' actions after they received notice of each potential Quiet Room Policy violation.

This Court also has noted that *Monell* liability attaches when a Defendant behaves like "an ostrich, burying his head in the sand by refusing to verify whether a substantial risk that he strongly suspected might exist actually existed." Doc. 113 at 14 (internal citations omitted).

Here, the record contains significant evidence suggesting that the Defendants did just that—through chronic failure to conduct meaningful investigations of suicides and suicide attempts and indifference to whether the Policy was violated, even in the face of direct evidence that it was.

Courts regularly allow evidence of municipal defendants' failure to investigate and take action after the alleged violation occurred—not to suggest that the failure to investigate caused the harm, but because this failure is further evidence of deliberate indifference to the harm. According to the Seventh Circuit, in "widespread practice" implicit policy cases, "what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not [a]isolated incident." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). And a very recent Seventh Circuit case illustrates the converse. In finding that a county was *not* deliberately indifferent to the risk of sexual misconduct, the Court relied on evidence proving that the county investigated all incidents and that "the employees concerned were fired, reprimanded, forced to resign, and even prosecuted. When complaints arose . . . the County took action. A vague complaint resulted in an inquiry. Sexualized comments to a coworker resulted in a written warning that appeared to have corrected his behavior." *Doe v. Vigo County, Indiana*, 905 F.3d 1038, 1046 (7th Cir 2018).

Here, in order to prove that the County "acquiesced" in Policy violations, Plaintiff must be permitted to present the same type of evidence the Seventh Circuit cited in *Doe*—evidence about the County's inadequate suicide investigation process, its failure to discipline any staff member for Quiet Room Policy violations, and its failure to make changes to jail policy and practice in the wake of each incident. In this case (unlike in *Doe*, where the record was replete with evidence of the remedial measures the county implemented to abate the risk of harm caused

by sexual misconduct), the evidence will demonstrate that the Defendants took no action at all to redress the risk of harm caused by violations of the Quiet Room Policy. *Cf. Estate of Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422, at *3 (N.D. Ill. Jan. 26, 1996) (denying the defendant's motion *in limine* to bar "evidence that this event did not result in any change to the customs, practices, policies and procedures of the City of Harvey because "failure to make changes in practice in the aftermath of this incident allowed an inference that the officers' actions were 'the way things are done and have been done. . .' and thus reflected city policy."); *Bordanaro v. McLeod,* 871 F.2d 1151, 1166-67 (1st Cir. 1989) (concluding that the trial judge properly admitted evidence of the lack of proper internal investigation and the failure to take strong disciplinary action against officers involved in an attack as such evidence was relevant to showing policy and practice); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985) (concluding that the lack of reprimands, discharges, policy changes and the lack of attention following an incident in which police acted recklessly and killed an innocent victim allowed for an inference that this was "the way things are done and have been done in the City of Borger," and thus reflected city policy).

## CONCLUSION

For the foregoing reasons, this Court should enter an order *in limine* providing that Plaintiff may introduce evidence of the 20 violations listed in this motion and of the Defendants' actions and failures to act in response to each of the violations.

Respectfully submitted,

**DWAYNE WHITE**

By: /s/ Sheila A. Bedi
One of his attorneys

Locke E. Bowman
Sheila A. Bedi

17

David M. Shapiro
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-1271

LaToya M. Berry
Law Offices of LaToya M. Berry
901 West Main
Belleville, Illinois 62220
 (618) 567-4837

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that the foregoing document was electronically served on all counsel who have filed appearances in this case via the Court's CM/ECF system on November 15, 2018.

/s/ Sheila A. Bedi