IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DWAYNE WHITE, as Administrator of the ESTATE OF BRADLEY C. SCARPI, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:16-CV-00560 |
| v. | ) ) ) | The Hon. J. Phil Gilbert |
| ST. CLAIR COUNTY SHERIFF RICHARD WATSON, *et al*., | ) ) ) | Magistrate Judge Donald Wilkerson |
| Defendants. | ) | |

### PLAINTIFF'S TRIAL BRIEF

### BRIEF SUMMARY OF THE FACTS

Bradley Scarpi entered the St. Clair County Jail on April 10, 2014. At the time of this admission, he suffered from a longstanding opioid addiction. His mother and his sister had recently died. As Mr. Scarpi's medical records make clear, Mr. Scarpi battled depression and anxiety related mental illness throughout his life.

On May 23, 2014, Mr. Scarpi sought jail officers' protection from other detainees on his cell block, who were threatening him with physical harm. The officers decided to house Mr. Scarpi in E-Max Block, the segregation unit of the jail, the unit generally considered the most punitive and the harshest. While in segregation Mr. Scarpi repeatedly told Defendant Officer Christopher Lanzante and other detainees that he was suicidal and required urgent assistance. The other detainees who were housed with Mr. Scarpi, including Ronnie Gully, David Garcia, Randy McCallum, and Dominic Hood, who will testify at the trial, heard Mr. Scarpi tell Officer Lanzante that Mr. Scarpi was suicidal. Mr. Gully also directly informed Officer Lanzante that Mr. Scarpi was suicidal. Officer Lanzante ignored this information and—after delivering cruel

taunts ("If you kill yourself, you'll be one more dead motherfucker.")—walked away from Mr. Scarpi, leaving him alone and unassisted in the segregation cell. About forty-five minutes after his last encounter with Defendant Lanzante, Mr. Scarpi hung himself.

The St. Clair County Jail has two policies related to suicide prevention: the Quiet Room Policy and the Cell Check Policy. Two months prior to Mr. Scarpi's suicide, Joshua Jurcich died by suicide in the other segregation Block, F-Max. In the year before and the year after Mr. Scarpi's death, multiple other detainees engaged in acts of self-harm and suicide attempts that would have been prevented had Jail officials ensured compliance with their own policies. St. Clair County officials have never disciplined officers for their actions or inactions related to suicide prevention. In the aftermath of a suicide, a suicide attempt or an incident of self-harm, St. Clair County officials conduct no investigation sufficient to determine if officers complied with policy. Nor have they ever changed their policies or practices in an effort to save lives or abate the widespread risk of suicide in their jail.

## PLAINTIFF'S CLAIMS

### Count I – 42 U.S.C. §1983 Failure to Protect Against the Risk of Suicide Against Defendant Lanzante

The Supreme Court recently established that "objective reasonableness" is the test to apply when evaluating the constitutionality of a use of force against a person being detained prior to trial. The Court held that the Eighth Amendment standard should not be applied in the jail context. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474-75 (2015).

The Seventh Circuit has recognized that, because the Eighth Amendment cannot apply to pretrial detainees, the Fourteenth Amendment's "objectively unreasonable" standard is not limited to use of force claims and instead applies broadly in the pre-trial detention context. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). In *Miranda*, the court considered

2

a claim of inadequate medical care, and noted that "[w]e see nothing in the logic the Supreme Court used in *Kingsley* that would support . . . dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause." *Id.* The Ninth and the Second Circuit have also held that *Kingsley* requires an objective standard in non-use of force cases challenging conditions of pretrial detention. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (holding that the objective standard applies to pretrial failure to protect claims); *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) (holding in a general jail conditions case alleging *inter alia*, overcrowding and unsanitary conditions that "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.").

District courts in the Seventh Circuit have uniformly applied *Kingsley* and *Miranda* to all manner of pretrial conditions claims—including a number of cases relating to the risk of suicide. *See Cento v. Marion County Sheriff's Office*, No. 1:17-cv-00431-TWP-DLP, 2018 WL 3872221, at *6 (S.D. Ind. Aug. 15, 2018) (applying *Miranda* to a jail suicide case); *Stidimire v. Watson*, No. 17-CV-1183-SMY-SCW, 2018 WL 4680666, at *4 (S.D. Ill. Sept. 28, 2018) (same); *Corbier v. Watson*, No. 16-CV-257-SMY-SCW, 2018 WL 4815391, at *3 (S.D. Ill. Oct. 4, 2018) (same); *see also Moore v. Germaine*, No. 18-cv-01378-JPG, 2018 WL 4027575, at *1 (S.D. Ill. Aug. 23, 2018) (applying *Miranda* to environmental jail conditions); *Thurman v. Dart et al.*, No. 18 C 2720, 2018 WL 5315208, at *5 (N.D. Ill. Oct. 26, 2018) (applying *Miranda* to a case involving the use of restrains on a pre-trial detainee); *Paredes v. Cook County*, No. 15 C 3634, 2018 WL 4955865, at *3 (N.D. Ill. Oct. 12, 2018) (applying *Miranda* to inhumane jail conditions and medical care claims); *McWilliams v. Cook County*, No. 15 C 53, 2018 WL 3970145, at *6

(N.D. Ill. Aug. 20, 2018) (applying *Miranda* to conditions claim arising out of a flooded hallway and related medical care claims).

In this case, Plaintiff will present evidence to establish that Defendant Lanzante's conduct was objectively unreasonable in light of Mr. Scarpi's risk of suicide. This evidence will include:

- Testimony from four witnesses who heard Mr. Scarpi tell Defendant Lanzante that he was suicidal and who heard Defendant Lanzante respond with curse words and taunts and observed Defendant Lanzante take no action to protect Mr. Scarpi.
- Testimony from one witness who told Lanzante himself that Mr. Scarpi was suicidal and again heard Mr. Lanzante respond with curse words and again fail to take action.
- The video of Mr. Lanzante's cell checks of E-Max shortly before Mr. Scarpi's suicide.
- Defendant Lanzante's own inconsistent testimony.

**Count II: 42 U.S.C. §1983 *Monell* Claim Against Defendant Watson in his Official Capacity Based on a Widespread Practice of Disregarding the Quiet Room Policy**

As clarified in the Court's summary judgment ruling, the specific widespread practice at issue here relates to failure to comply with the "Quiet Room Policy" which requires officers to take action when they have knowledge from either an intake screening, or a detainee's actions or verbal statements that there exists a risk of suicide or homicide. Doc 113 at p. 24. Plaintiff's *Monell* claim requires a showing that the challenged municipal action "was taken with deliberate indifference as to its known obvious consequences." Doc. 113 at 19. (internal citations omitted). As this Court has ruled, "deliberate indifference may be shown . . . where municipal decision makers are put on notice that a policy or practice is ineffective and leads to constitutional violations but they continue to adhere to the same approach." Doc. No. 113 (*citing Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 411 (U.S.1997)). A successful

*Monell* claim requires proof that decision makers were "deliberately indiffere[nt] to the risk that a violation of a particular constitutional or statutory right will [occur as a result of the widespread practice]." *Id.*; *see also Hahn v. Walsh*, 762 F.3d 617, 636 (7th Cir 2014) (finding that in order to prove *Monell* liability based on widespread practice, plaintiff must prove the Defendants were aware of any risk posed by the challenged policy and failed to take necessary remedial steps); *Hall v. City of Chicago*, 989 F. Supp. 2d 699, 708 (N.D. Ill. 2013) (stating that facts tending to show that the City policymakers were aware of the behavior of officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior, can prove a widespread practice *Monell* claim).

In "widespread practice" implicit policy cases, "what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not [a] isolated incident." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *see also Doe v. Vigo County, Indiana*, 905 F.3d 1038, 1046 (7th Cir 2018) (finding that deliberate indifference to a widespread practice did not exist when, as a result of defendants' actions "the employees (who engaged in the challenged practice) were fired, reprimanded, forced to resign, and even prosecuted. When complaints arose . . . the County took action); *cf. Estate of Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422, at *3 (N.D. Ill. Jan. 26, 1996) (denying the defendant's motion *in limine* to bar "evidence that this event did not result in any change to the customs, practices, policies and procedures of the City of Harvey because "failure to make changes in practice in the aftermath of this incident allowed an inference that the officers' actions were 'the way things are done and have been done. . .' and thus reflected city policy"); *Bordanaro v. McLeod,* 871 F.2d 1151, 1166-67 (1st Cir. 1989)

(concluding that the trial judge properly admitted evidence of the lack of proper internal investigation and the failure to take strong disciplinary action against officers involved in an attack as such evidence was relevant to showing policy and practice); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985) (concluding that the lack of reprimands, discharges, policy changes and the lack of attention following an incident in which police acted recklessly and killed an innocent victim allowed for an inference that this was "the way things are done and have been done in the City of Borger," and thus reflected city policy.)

Under Seventh Circuit law, "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy." *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987) (vacated on other grounds); *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir.1996) ("although it occurred after [the plaintiff's] experience, [the subsequent incident of alleged excessive force] may have evidentiary value for a jury's consideration [of] whether the City and policymakers had a pattern of tacitly approving the use of excessive force"); *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir.1991) ("Contrary to the City's exhortation that the date an incident occurs marks the outside date for evidence-gathering on such an issue, we think that actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident."); *Starks v. City of Waukegan*, No. 09 C 348, 2013 WL 5874563, at *2 (N.D. Ill. 2013) ("A *Monell* claim may rest on alleged constitutional violations that occur after misconduct at issue in that case" because subsequent behavior can be indicative of Defendants' approval of the challenged practice.); *Doe v. Vigo County, Indiana*, 905 F.3d 1038, 1046 (7th Cir 2018) (finding that deliberate indifference to a widespread practice did not exist when, as a result of defendants' actions "the employees (who

6

engaged in the challenged practice) were fired, reprimanded, forced to resign, and even prosecuted. When complaints arose . . . the County took action.).

Plaintiff will present evidence that the widespread practice of disregarding the Quiet Room Policy exists, that Defendants were aware of the practice and that they took no action to abate the risks posed by this practice. This evidence will include:

- Testimony from Philip McLaurin, former Superintendent of St. Clair County Jail, about his knowledge of Quiet Room Policy violations and his subsequent actions and inactions.
- Testimony from Defendant Watson about his knowledge of Quiet Room Policy violations and his subsequent actions and inactions.
- Evidence about the 20 Quiet Room violations set forth in detail in Doc. 132.

### Count III –Against Defendant Watson in his Official Capacity for Failure to Accommodate Mr. Scarpi's Disability under the Americans with Disabilities Act

The issues before the Court on this count are: (1) whether Mr. Scarpi was a qualified individual with a disability; (2) whether Defendants were aware of Mr. Scarpi's disability; and (3) whether Defendants failed to reasonably accommodate the disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Mental Impairment" is defined as "any mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." *Duda v. Bd. of Educ. Of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1058 (7th Cir. 1998) (quoting 29 C.F.R. § 1630.2(h)(2)). "Major life activities" include

basic functions such as sleeping, breathing, learning, concentrating, thinking, and communicating.  29 C.F.R. § 1630.2(h)(i).

Courts have consistently found that different types of mental illnesses constitute disabilities within the meaning of the ADA as long as the mental illness substantially limits one or more major life activities.  *See, e.g.*, *Ogborn v. United Food & Commercial Workers Union*, *Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) ("Major depression can constitute a disability under the ADA"); *Bultemeyer v. Fort Wayne Comty. Sch.*, 100 F.3d 1281, 1284 (7th Cir. 1996) (bipolar disorder and paranoid schizophrenia are disabilities as "the ADA specifically includes mental illness as a disability"); *Duda v. Bd. of Educ. Of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 n.10 (7th Cir. 1998) (collecting cases recognizing mental illnesses as disabilities under the ADA); *Wiltse v. Discover Fin. Servs., Inc.*, No. 07 CV 7073, 2008 WL 2839259, at *4 (N.D. Ill. 2008) (severe anxiety and depression is a mental impairment that qualifies as a disability under the ADA).

The evidence will show that Mr. Scarpi lived with a disability—including his medical records from St. Elizabeth's Hospital that document that Mr. Scarpi suffered from anxiety for many years, and his records from St. Clair County Jail reflecting that, in 2009, a psychiatrist there diagnosed Mr. Scarpi with Adjustment Mood Disorder with depressed mood and prescribed him Remeron, an anti-depressant, to treat his mental illness and symptoms of insomnia.  Members of Mr. Scarpi's family will testify as to Mr. Scapri's disabling symptoms.  As explained in greater detail above, Mr. Scarpi made the jail aware of his disability when he expressed suicidal ideation.  And their failure to place him in a suicide proof cell once they became aware of this risk is a failure to accommodate under the ADA.

**Count IV for Wrongful Death Against Defendant Lanzante**

Under Illinois law, jailers owe a duty of care to prisoners, which includes the duty to guard against the possibility of suicide." *Belbachir v. United States*, No. 08 C 50193, 2012 WL 5471962, at *2 (N.D. Ill. Nov. 9, 2012) (citing *Dezort v. Vill. of Hinsdale*, 342 N.E.2d 468, 472-73 (Ill. App. Ct. 1976)). Thus, the relevant questions for the jury are whether Defendant Lanzante, as a correctional officer, was negligent in his duty toward Mr. Scarpi and whether Mr. Scarpi's suicide was "a foreseeable consequence of the negligence of his jailers." *Jutzi-Johnson v. United States*, 263 F.3d 753, 756 (7th Cir. 2001). The evidence the Plaintiff will present to show Defendants' liability on the preceding theories will also be sufficient to establish their liability for wrongful death under Illinois law.

### Count V for Wrongful Death Against Watson in his Official Capacity
### Count VI Against St. Clair County for indemnification

Defendant Sheriff Watson in his official capacity is liable under the doctrine of *respondeat superior* if Defendant Lanzante is found liable on Plaintiff's state law claim for wrongful death. *See Williams v. Village of Maywood*, No. 13-cv-8001, 2016 WL 4765707, at *6 (N.D. Ill. Sept. 13, 2016) (denying summary judgement as to Plaintiff's "wrongful death claim against the Village, because Babicz was acting within the scope of his employment when he shot McCord, meaning the Village faces potential *respondeat superior* liability"); *Colyer v. City of Chicago*, No. 12 C 04855, 2014 WL 8796112, at *9 (N.D. Ill. Dec. 8, 2014) (respondeat superior claim remains where summary judgement denied as to Plaintiff's wrongful death claim); *Awalt v. Marketti*, No. 11 C 6142, 2012 WL 1161500, at *9 (N.D. Ill. Apr. 9, 2012) (respondeat superior claim stands were state law claim for wrongful death still pending).

Under Illinois law, the County is also obligated to indemnify for both state and federal law tort judgments arising out of any act or omission by the Defendant Officers occurring within

the scope of their employment. 745 Ill. Comp. Stat. 10/9-102 (2011); *Yang v. Hardin*,137 F.3d 522, 524 (7th Cir. 1998).

## DAMAGES

"In a section 1983 action, the estate may recover damages for loss of life, conscious pain and suffering experienced by the decedent prior to death, and punitive damages in a case in which the standard . . . has been satisfied." *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1190 (7th Cir. 1985). Further, the Illinois Wrongful Death Act allows the trier of fact to "give such damages as [the trier of fact] shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such [wrongful] death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." *Ford-Sholebo v. U.S.*, 980 F. Supp. 2d 917, 1000 (N.D. Ill. 2013). Next of kin may also recover for a loss of "society" which includes loss of the decedent's "companionship, guidance, advice, love, and affection." *Id.* Under § 1983, punitive damages are available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (U.S. 1983).

The Plaintiff here files on behalf of the estate of Mr. Scarpi. The beneficiaries are Mr. Scarpi's two sons, Dylan Delisle-Scarpi and Bradley Scarpi Jr. The Plaintiff seeks to recover for the damages causes to Mr. Scarpi himself and for the harm caused to his children as a result of his death. Further, Plantiff seeks punitive damages.

Mr. Scarpi suffered tremendously during his last stay at the Jail which resulted in his death. Mr. Scarpi's family, including his two sons, have also experienced substantial pain and suffering as a result of Mr. Scarpi's death, including: (1) pain and suffering in the immediate

aftermath of Mr. Scarpi's tragic death; (2) pain and suffering in the long term as the family struggles to cope with the loss of a loved one; and (3) for his two sons, loss of the love, companionship, support, services, and care Mr. Scarpi could have provided to them had he lived. Plaintiff, as Administrator of the Estate and on behalf of the next of kin, claims damages for the loss of life suffered by Mr. Scarpi as well as for the pecuniary losses suffered by his next of kin. The evidence as described in detail above will demonstrate that the Defendants acted with "callous indifference" to Mr. Scarpi's federally protected rights

                                Respectfully submitted,

                                **DWAYNE WHITE**

                                By: /s/ Vanessa del Valle
                                    One of his attorneys

Locke E. Bowman
Sheila A. Bedi
David M. Shapiro
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-1271

LaToya M. Berry
Law Offices of LaToya M. Berry
901 West Main
Belleville, Illinois 62220
(618) 567-4837

## CERTIFICATE OF SERVICE

      The undersigned, an attorney, certifies that the foregoing document was electronically served on all counsel who have filed appearances in this case via the Court's CM/ECF system on November 20, 2018.

                                            /s/ Vanessa del Valle